IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KEITH TYRONE TROXLER, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | 1:14CV592 |
| ) | |
| BRIAN WELLS, ) | |
| ) | |
| Respondent. ) | |

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Petitioner Keith Tyrone Troxler, a prisoner of the State of North Carolina, brings a Petition [Doc. #1] seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which Respondent opposes with a Motion for Summary Judgment [Doc. #4]. According to the Petition, on May 17, 2012, in the Superior Court of Guilford County, Petitioner was found guilty of (1) conspiracy to traffic in 400 grams or more of cocaine by possession and (2) attempting to traffic in 400 grams or more of cocaine. He was sentenced to a total of 175 to 219 months of imprisonment. (Petition, §§ 1-6.) Petitioner filed an unsuccessful direct appeal, as well as a Motion for Appropriate Relief (MAR) in Guilford County. (Petition, §§ 9, 11.) After the MAR was denied, Petitioner sought, but was also denied, a writ of certiorari from the North Carolina Court of Appeals. (Id., § 11.) Petitioner next submitted his Petition to this Court. After being ordered to answer, Respondent filed his Motion for Summary Judgment.

Facts

The North Carolina Court of Appeals summarized the evidence at Petitioner's trial as follows:

> The State presented evidence at trial tending to establish the following facts: Detective Richard Alston ("Detective Alston"), a detective in the Greensboro Police Department's vice division, received a tip from a confidential informant that a man named Christopher Byrd ("Byrd") was interested in purchasing a kilogram of cocaine. Posing as a drug dealer, Detective Roberto Monge ("Detective Monge")—another vice detective with the Greensboro Police Department—called Byrd in April 2011 to "tr[y] to set up a deal." Although Detective Monge and Byrd had a cell phone conversation about Byrd buying "half a kilo" from Detective Monge, that transaction fell through when Byrd failed to call Detective Monge to arrange the details.
>
> On 6 August 2011, Detective Monge received a voicemail message from Byrd indicating that Byrd had a "partner"—later identified at trial as Defendant—who was providing half of the money and was ready to purchase a kilogram of cocaine. Byrd agreed to the price and stated that he wanted to meet later that day to conduct the transaction. Throughout the afternoon, Detective Monge and Byrd exchanged several phone calls with Byrd delaying the meeting each time because he was unable to contact Defendant. Ultimately, Detective Monge and Byrd postponed the deal.
>
> On 9 August 2011, Byrd exchanged text messages with Detective Monge in which he stated that he had the money and would contact Detective Monge after he got off work that afternoon to arrange a time and place to meet. Byrd called Detective Monge at approximately 6:00 p.m., and the two men discussed meeting in the parking lot of a Wal–Mart store. During the conversation, Defendant got on the phone and told Detective Monge that he did not want to meet at the Wal–Mart parking lot because "[t]here's a lot of cameras up there" and he was "scared of the police[.]" As a result of this conversation, they did not meet that day.
>
> The following day, Detective Alston was surveilling Byrd's workplace and saw a white Oldsmobile arrive at about 3:00 p.m. Byrd got inside, and the car drove away. The car's registration was run through the DMV's computer system, and the car was identified as being registered to Defendant.
>
> Detective Monge spoke with Byrd several times after Byrd left work that day, and they initially decided to meet at a Sheetz gas station at 6:00 p.m. Detective

2

Monge, however, subsequently changed the meeting location back to the Wal–Mart parking lot. Shortly after arriving at the Wal–Mart, Detective Monge saw a white Oldsmobile pull in behind his vehicle. Defendant was driving, and Byrd was in the front passenger's seat.

Byrd got out of the Oldsmobile and approached the front passenger window of Detective Monge's car. After refusing to get inside, Byrd "flashed" the money to Detective Monge. When Detective Monge asked to take a closer look at the money, Byrd refused and told Detective Monge to go get the cocaine. Detective Monge, concerned that Byrd did not have all of the money, left the parking lot as if he was going to get the drugs. He then met with Detective Alston and decided not to take the drugs back to the parking lot and to instead arrest Byrd and Defendant.

When the "take-down" team took Byrd and Defendant into custody, they searched Defendant's car and found $15,350 in counterfeit bills in two vacuum-sealed packages. They also seized Byrd's and Defendant's cell phones and found text messages from Byrd to Defendant in which Byrd stated that the deal was "getting ready to go down" and that it was a "[d]one deal[.]"

Defendant was transported to the police station, where he waived his Miranda rights and agreed to speak with Detective Edward Buscino, Jr. ("Detective Buscino"). Defendant initially denied knowing anything about the counterfeit money and drugs, claiming that he picked Byrd up and drove him to the Wal–Mart so that Byrd could purchase some televisions. When Detective Buscino told Defendant that the police had observed him and Byrd picking up the counterfeit money from another individual, Defendant finally admitted that he had driven Byrd to the Wal–Mart parking lot with the knowledge that Byrd was going to attempt to buy drugs with the counterfeit money. Defendant also stated to Detective Buscino that he had told Byrd that "he didn't think it was a good idea to go purchase drugs" in the Wal–Mart parking lot but that he had nevertheless driven Byrd to the Wal–Mart despite his misgivings.

State v. Troxler, No. COA13-79, 2013 WL 5629601 at *1-3 (N.C. App. Oct. 15, 2013)

(unpublished), rev. denied, 367 N.C. 329, 755 S.E.2d 612 (2014).

## Petitioner's Claims

Petitioner raises five claims for relief in his Petition. The first is that Petitioner received ineffective assistance of counsel because his trial attorney failed to subpoena

3

Christopher Byrd to testify on his behalf. (Petition, § 12, Ground One; Respondent's Brief [Doc. #5], Ex. 9 at 3-4.) Petitioner's second claim is his appellate attorney provided ineffective assistance of counsel by failing to raise an issue on appeal. (Petition, § 12, Ground Two; Respondent's Brief, Ex. 9 at 4.) Petitioner's third and fourth claims assert that the State presented insufficient evidence to support his convictions for conspiracy to traffic in cocaine and for attempt to traffic in cocaine, respectively. (Petition, § 12, Grounds Three and Four.) Finally, Petitioner contends that he is actually innocent based on new evidence discovered after his trial. (Id., Attach.)

Standard of Review

This Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. "Clearly established Federal law" includes only "'holdings, as opposed to dicta,'" of the United States Supreme Court. White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Howes v. Fields, 132 S. Ct. 1181, 1187 (2012)). A state court decision is "contrary to" United States Supreme Court precedent if the state court decision either "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confronts a set of facts that are materially indistinguishable from a decision of [the

4

United States] Supreme Court and nevertheless arrives at a result different" from the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision involves an "unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). "[E]ven clear error will not suffice." White, 134 S. Ct. at 1702 (citing Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)). "Rather, 'as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Finally, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).

In this case, Petitioner raises five claims, as set out above. As discussed below, Petitioner's third and fourth claims, which challenge the sufficiency of the evidence presented, were previously raised and considered on direct appeal on the merits, thus triggering the deferential review set out above. Petitioner raised the remaining claims in his MAR, which was denied on the grounds of procedural bar. The Court considers each of Petitioner's claims in turn, as set out below.

Discussion

Petitioner's first claim alleges that he received ineffective assistance of counsel because his attorney failed to subpoena his co-conspirator, Christopher Byrd, as a witness at his trial. In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. See Strickland v. Washington, 466 U.S. 668 (1984). As to the first prong, a petitioner bears the burden of affirmatively showing deficient performance. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). As to the second prong, to establish prejudice, a petitioner must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

In Response to Petitioner's claim, Respondent notes that the state court MAR judge found this claim to be procedurally barred because Petitioner was in a position to raise it on direct appeal, but did not do so. The state court's application of a procedural bar would ordinarily bar this Court from considering the claim. However, Respondent acknowledges that "there could be some question . . . as to whether Petitioner was in an adequate position to have raised this ineffective assistance of trial counsel claim . . . on direct appeal." (Summary Judgment Brief [Doc. #5] at 6.) Therefore, Respondent raises the procedural bar only to preserve it as a defense, and proceeds to address the merits of Petitioner's first claim.[1]

---

[1] Ineffective assistance of counsel claims in North Carolina should generally be brought in MARs, not on direct appeal, although they can be decided on direct appeal where the record reveals that no further investigation or development is needed. Burch v. Brandon, No. 1:13CV10, 2015 WL 1646972, at *3

6

With respect to the merits of the first claim, the Court concludes that it is apparent that this claim should be denied because Petitioner fails to produce any evidence that Byrd was ready and willing to testify on his behalf. Therefore, Petitioner's attorney did not provide ineffective assistance by failing to subpoena Byrd. Petitioner does provide two pre-trial statements by Byrd stating that Petitioner "had nothing to do with what happen on 8/11/2011," and that Petitioner had "nothing to do with or where we was going until it was to late." (Summary Judgment Brief, Ex. 3 at 18, 19 (as written).) These statements were provided to the trial court by Petitioner and were referenced in a Motion to Dismiss filed by Petitioner's first appointed trial attorney. (Summary Judgment Brief, Ex. 3 at 56.) Petitioner also presents a transcript of Byrd's testimony from Byrd's own trial on October 2, 2012, several months after Petitioner's trial. At Byrd's trial, Byrd was convicted of drug trafficking and of possessing the counterfeit money, but was acquitted of the conspiracy charge for which Petitioner was convicted. Petitioner's MAR (Summary Judgment Brief, Ex. 9) also includes as an exhibit a statement written by Byrd after Byrd's conviction, asserting that Petitioner was "never on the phone nor did he know what was going on" at the time of their arrest, and that he had asked Petitioner "for a ride only." However, the MAR exhibits also indicate that Byrd was not available to testify at Petitioner's trial. Specifically, the MAR exhibits include a letter from Petitioner's appellate attorney to Petitioner regarding this

---

(M.D.N.C. April 14, 2015) (unpublished). In practice, it can be very difficult to tell which claims can be brought on direct appeal and which ones cannot. Id. at *4. Petitioner's current claim appears to be one that he could not have brought on direct appeal to the extent that establishing the claim would require some investigation or supplementation of the record in order to ascertain his former attorney's reason for not subpoenaing Byrd. The same is true for any evidence of Byrd's availability, willingness to testify, and value as a defense witness. In the circumstances, Respondent has chosen to address this claim on the merits, and the Court does so as well.

7

potential claim. According to the letter, Petitioner's appellate attorney spoke to Petitioner's trial attorney, and the trial attorney reported that he attempted to call Byrd as a witness at Petitioner's trial, but that Byrd's attorney would not allow Byrd to testify at Petitioner's trial. According to the letter, Byrd's attorney also told Petitioner's trial attorney that if Petitioner called Byrd to the stand, Byrd would invoke his right to be free from self-incrimination under the Fifth Amendment of the United States Constitution and would refuse to testify. Nowhere in Byrd's statement does he deny this in any way. Thus, based on the evidence presented with the MAR, Petitioner's trial attorney looked into calling Byrd as a witness and discovered that Byrd would not testify and that he would invoke the Fifth Amendment if called. Therefore, counsel's strategic decision not to call Byrd did not fall below the reasonable standard for representation by a defense attorney. Further, there is no evidence that Byrd would not have refused to testify if called, just as his attorney indicated. Therefore, Petitioner cannot show any prejudice from his attorney's decision not to attempt to call Byrd as a witness. Petitioner fails to satisfy either prong of the Strickland analysis and his first claim for relief should be denied.

Petitioner's second claim is that his appellate attorney failed to pursue an argument on direct appeal. Petitioner does not identify that argument in his Petition. However, in his MAR, he claimed that appellate counsel failed to raise an argument that there was insufficient evidence to show that Petitioner intended to commit the crime of attempting to traffic in cocaine by possession.[2] The same standards set out above as to Petitioner's first

---

[2] As with the prior claim, the MAR court found this claim to be procedurally barred because Petitioner failed to raise it on appeal. Respondent raises the procedural bar to preserve it as a defense, but proceeds to address this claim on the merits, given that Petitioner's appellate attorney could not have raised an ineffective

8

claim of ineffective assistance also apply to claims that appellate counsel provided ineffective assistance of counsel. See Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008). Thus, Petitioner must show that his attorney's performance fell below a reasonable standard for defense attorneys and that he was prejudiced by this performance. Appellate counsel need not raise on appeal every non-frivolous issue requested by a defendant. Jones v. Barnes, 463 U.S. 745, 750-54 (1983); see also Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989) (declaring that counsel pursued sound strategy when he "determined what he believed to be petitioner's most viable arguments and raised them on appeal"). Winnowing out weaker arguments to press forward with more important points constitutes an important part of effective appellate advocacy. Jones, 463 U.S. at 751-52. Prejudice can arise if "'counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.'" Bell v. Jarvis, 236 F.3d 149, 180 (4th Cir. 2000)(quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)).

In the direct appeal in this case, with respect to the charge of attempt to traffic in cocaine, the North Carolina Court of Appeals noted that "trafficking in cocaine by possession in violation of § 90–95(h)(3)(c) requires proof of (1) the defendant's knowing possession of cocaine; and (2) the amount possessed being 400 grams or more." Troxler, 2013 WL 5629601 at *3 (citing State v. Diaz, 155 N.C. App. 307, 319, 575 S.E.2d 523, 531 (2002)). The Court of Appeals further explained that "'[t]he two elements of an attempt to commit a crime are: (1) An intent to commit it, and (2) an overt act done for that purpose,

---

assistance claim against herself on direct appeal. Therefore, the Court will address the claim on its merits as well.

9

going beyond mere preparation, but falling short of the completed offense.'" Troxler, 2013 WL 5629601 at *4 (quoting State v. Powell, 277 N.C. 672, 678, 178 S.E.2d 417, 421 (1971)). According to the Court of Appeals decision on direct appeal, Petitioner's attorney raised a sufficiency of the evidence argument in her principal brief on direct appeal as to the overt act element, but not the intent element. She then also argued the intent element in a reply brief. The Court of Appeals noted that the intent argument was not properly before the court due to the failure to raise it in the principal brief. Petitioner faults appellate counsel for failing to properly raise this additional argument.

However, the Court of Appeals ultimately determined that "the State presented sufficient evidence of overt acts by Defendant *in furtherance of his intent* to traffic in cocaine by possessing 400 grams or more." Troxler, 2013 WL 5629601 at *5 (emphasis added). In addition, in recounting the evidence presented at trial, the Court of Appeals also noted Petitioner's "communications with Byrd regarding the planning of the 'deal,' his admitted awareness of the transaction, and his act of driving Byrd to the designated location to consummate the sale." Troxler, 2013 WL 5629601 at *4. Thus, this ineffective assistance claim fails because it is abundantly clear that an insufficiency of the evidence argument as to intent would have failed to succeed. Had Petitioner's attorney specifically raised the claim, the North Carolina Court of Appeals would have viewed all evidence in the light most favorable to the State to determine if there was sufficient evidence to support a reasonable inference by the jury that Petitioner intended to possess 400 grams or more of cocaine. Id. at *5. There was abundant evidence that he did, as set out in the summary of the evidence

above. Taken as a whole, this evidence supports the inference that Petitioner agreed to purchase a kilogram of cocaine along with Byrd and that they attempted to do so. Therefore, Petitioner intended to traffic in more than 400 grams of cocaine. Had his attorney raised a sufficiency of the evidence argument as to intent on direct appeal, it would have surely failed. Appellate counsel did not perform deficiently by failing to raise this meritless claim and, in any event, did not prejudice Petitioner by not specifically raising intent as a separate issue. Petitioner's second claim for relief should be denied.

Petitioner's third and fourth claims are that there was insufficient evidence to support his convictions. In his direct appeal, Petitioner raised insufficiency of the evidence claims as to his conspiracy conviction and the overt act element of his attempted trafficking conviction. The North Carolina Court of Appeals denied both of these claims on their merits. Therefore, the higher standards of review found in § 2254(d) apply to these two claims. In a habeas corpus action, with respect to a claim of insufficient evidence, the Court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in the original). A court reviewing the sufficiency of the evidence "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." <u>United States v. Tresvant</u>, 677 F.2d 1018, 1021 (4th Cir. 1982). It has further been held that "circumstantial evidence may support a verdict of guilty, even though it does not exclude every reasonable hypothesis

11

Case 1:14-cv-00592-TDS-JEP Document 10 Filed 08/12/15 Page 11 of 15

consistent with innocence." United States v. George, 568 F.2d 1064, 1069 (4th Cir. 1978). The standard is obviously rigorous because, as the Supreme Court has reiterated, "the writ of habeas corpus has historically been regarded as an extraordinary remedy." Brecht v. Abrahamson, 507 U.S. 619, 633 (1993).

Here, the conspiracy charge requires that Petitioner entered into an express or implied agreement with another person or persons "'to do an unlawful act or to do a lawful act by unlawful means.'" Troxler, 2013 WL 5629601 at *3 (quoting State v. Burmeister, 131 N.C. App. 190, 199, 506 S.E.2d 278, 283 (1998)). As noted above, "trafficking in cocaine by possession in violation of § 90–95(h)(3)(c) requires proof of (1) the defendant's knowing possession of cocaine; and (2) the amount possessed being 400 grams or more." Troxler, 2013 WL 5629601 at *3 (citing State v. Diaz, 155 N.C. App. 307, 319, 575 S.E.2d 523, 531 (2002)). In considering Petitioner's insufficiency argument on direct appeal as to the conspiracy charge, the North Carolina Court of Appeals noted all the points of evidence set out above concerning Petitioner's participation in the deal, including that "the State presented evidence that (1) Defendant and Byrd exchanged 43 text messages and phone calls between 8 and 10 August 2011 discussing the plan to purchase the "kilo" of cocaine from Detective Monge for $32,000; (2) on 10 August 2011, after picking up the counterfeit money, Defendant drove his car, with Byrd in the passenger seat, to the Wal–Mart parking lot, as agreed upon by the parties; and (3) Defendant, in his post-arrest statement, admitted that he was 'aware of th[e] cocaine deal' and that although he shared with Byrd the fact that he did not 'think it was a good idea to go purchase drugs' in the Wal–Mart parking lot, he

12

drove with Byrd to the location anyway because he did not 'think [they] would get caught.'" Troxler, 2013 WL 5629601 at *3. The Court of Appeals also noted that, whatever reservations Petitioner may have expressed about the deal, he still continued to drive Byrd to the buy site and remained present while Byrd took the money to Monge's automobile to complete the transaction. With respect to the attempt conviction, the Court of Appeals noted that "the evidence shows that (1) Defendant, along with Byrd, obtained counterfeit money on the way to the drug deal; (2) Defendant and Byrd arrived at the location where Defendant knew—based on prior conversations with Byrd and Detective Monge—that the drug transaction was to be conducted and parked his car behind Detective Monge's vehicle; (3) Defendant remained at the scene while Byrd attempted to purchase the cocaine with the counterfeit money; and (4) Defendant was found in his car waiting for Detective Monge to return with the kilogram of cocaine when the 'takedown' team took Defendant and Byrd into custody." Troxler, 2013 WL 5629601 at *5. Given all of the evidence, there was more than sufficient evidence for the jury to find that all elements of both crimes were met by Petitioner's conduct. Therefore, the North Carolina Court of Appeals' decision was not contrary to, or an unreasonable application of, the relevant Supreme Court precedent. Petitioner's third and fourth claims for relief should be denied.

Petitioner's final claim is that he is innocent based on new evidence uncovered following his trial. This evidence consists of Byrd's testimony at Byrd's trial and the post-trial written statement from Byrd asserting that Petitioner was "never on the phone nor did he know what was going on" at the time of their arrest, and that he had asked Petitioner "for

13

Case 1:14-cv-00592-TDS-JEP   Document 10   Filed 08/12/15   Page 13 of 15

a ride only." The MAR court held this claim to be procedurally barred. Moreover, even if not barred, this claim still does not entitle Petitioner to relief. With respect to this claim, the Court notes that the United States Supreme Court has held that a claim of actual innocence can act as a "gateway" to allow an otherwise procedurally defaulted or time-barred claim to be heard. McQuiggin v. Perkins, ___ U.S. at ___, 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. We have recognized, however, that a prisoner 'otherwise subject to defenses of abusive or successive use of the writ [of habeas corpus] may have his federal constitutional claim considered on the merits if he makes a proper showing of actual innocence.' In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." (internal citations omitted)). However, in this case, it is not clear that Petitioner is asserting an underlying constitutional claim. Moreover, to demonstrate actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 327 (1995); see McQuiggin v. Perkins, ___ U.S. at ___, 133 S. Ct. 1924, 1935 (2013). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. Here, Petitioner proffers Byrd's later testimony and statements. Although these would counter Monge's

14

testimony in some respects, in the end Byrd's version of events would simply create factual disputes to be resolved by the jury. While the jury could believe Byrd and acquit Petitioner, it could also believe Monge and convict Petitioner, particularly in light of the text messages from Byrd, Petitioner's post-arrest statements that he knew he was driving Byrd to Wal-Mart for a drug deal, and the fact that he continued to drive and to be present for the deal.[3] Petitioner's proffered evidence does not demonstrate "actual innocence" because he has not shown that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Therefore, his fifth claim for relief should be denied.

IT IS THEREFORE RECOMMENDED that Respondent's Motion for Summary Judgment [Doc. #4] be granted, that the Petition [Doc. #1] be denied, and that this action be dismissed.

This, the 12th day of August, 2015.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[3] The record also includes police reports reflecting statements by Byrd at the time of arrest implicating Petitioner, specifically statements by Byrd to two different officers indicating that Petitioner had agreed to provide transportation to the deal in exchange for ¼ of the cocaine, and thus creating internal inconsistency in Byrd's own accounts if all of Byrd's various statements are considered together. (Summary Judgment Brief, Ex. 3 at 32, 49.) In addition, Byrd's testimony at his own trial includes the far-fetched assertion that the other individual who spoke to Detective Monge to set up the location for the deal, and whose voice was identified by Detective Alston as being that of Petitioner, was instead, according to Byrd, just Byrd "act[ing] like I was somebody else" in order to make Detective Monge "think that my partner didn't want to meet at [the Walmart] neither." (Summary Judgment Brief, Ex. 9.) Byrd also testified that the telephone calls from Petitioner's phone to Detective Monge while the deal was being set up occurred when Byrd used Petitioner's phone without Petitioner's knowledge. In explaining this, Byrd testified that Petitioner went into Home Depot and left his phone in the car since Petitioner didn't "carry his phone because he was with a girl," and "[h]is phone was in the front seat" so Byrd "cut it on and used his phone." (Id.) These assertions strain credibility, and do not provide a basis to conclude that it is likely that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.

15